UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

2016 NOV 28 PM 3:21

U.S. DISTRICT COURT
NEW HAVEN, CT.

IN RE SEARCH OF:

462 HILLSIDE AVENUE
HARTFORD, CONNECTICUT AND
TAN-COLORED 2002 CHEVROLET
IMPALA BEARING CT LICENSE PLATE
AD-45675

)
)
)
)
)
)

UNDER SEAL

3:16mj6663(JGM)

Case No. 3:16 mj 664(JGM)

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Wendy Bowersox, a Special Agent with the Federal Bureau of Investigation, being first

duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit under Rule 41 of the Federal Rules of Criminal Procedure in

support of an application for a search warrant for the address of 462 Hillside Avenue, 1st Floor,

Hartford, Connecticut ("TARGET PREMISES"), which is believed to be the residence of

TONEY KELSEY, also known as "Blaze," and a tan-colored 2002 Chevrolet Impala bearing

Connecticut license plate AD-45675, registered to Patty Hamlett ("TARGET VEHICLE"), as

further described in Attachments A-1 and A-2, respectively, for the things described in

Attachment B.  All attachments are incorporated herein by reference.

2.      I have been employed as a Special Agent of the FBI since 2010, and am currently

assigned to the Violent Crimes Against Children squad.  I am a federal law enforcement officer

who is engaged in enforcing federal criminal laws.  While employed by the FBI, I have

investigated federal criminal violations related to cybercrime, child exploitation, online

enticement, child pornography, and domestic minor sex trafficking.  I have gained experience

1

through training at child exploitation trainings and everyday work related to conducting these types of investigations. I have served as an affiant on and executed numerous search warrants, including search warrants for electronic accounts like this one. I am an "investigative or law enforcement officer" of the United States, within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3.      I am familiar with the facts and circumstances of this case. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officials and other individuals, my review of documents related to this investigation, oral and written communications with others who have personal knowledge of the events and circumstances described herein, review of public source information, including information available on the Internet, and records received via legal process. Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrants, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the probable cause for the requested warrants.

4.      Together with Special Agents of Homeland Security Investigations, detectives from the Connecticut State Police, and officers of the Hartford and Wethersfield Police Departments, I am investigating a male individual named TONEY KELSEY, also known as "BLAZE" and a female individual named KARI YATES, also known as "Miss Money" or "K," for violations of federal law. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Sex Trafficking of a Minor, in

violation of 18 U.S.C. § 1591, and Conspiracy to Commit Sex Trafficking, in violation of 18

U.S.C. § 1594(c), and related offenses have been committed and that evidence, fruits, and

instrumentalities of those offenses will be located at the TARGET PREMISES and in the

TARGET VEHICLE.

## BACKGROUND ON PROSTITUTION OPERATIONS

5.      The website located at http://www.backpage.com, hereinafter "Backpage," is an

Internet site consisting of classified advertisements specific to designated geographical areas.

When users post an advertisement, they may designate the area in which the ad should be posted.

In Connecticut, there are four designated geographical sections on Backpage: Hartford, New

Haven, Eastern Connecticut, and Northwest Connecticut.

6.      Within each geographical section on the Backpage website are several different

categories of goods and services that users may advertise.  Those categories include cars, homes

for sale or rent, furniture, employment, among others.  There is also an "adult" section, which

includes the categories of escorts, body rubs, strippers & strip clubs, dom & fetish, ts, male

escorts, phone & websites, and adult jobs.

7.      In order to post an advertisement on Backpage, a user must follow certain steps,

in substance as follows:

      a.  Navigate, on either a computer or other device capable of accessing the Internet,

           including a smartphone (a cellular phone with Internet browsing capabilities) to

           the Backpage website;

      b.  Choose a geographical area and category of good or service to be offered, for

           example, New Haven escorts;

    c.   Write an advertisement, including a title, more specific location, description of service offered, email address, and phone number;

    d.   Upload, if desired, photographs to be posted with the advertisement;

    e.   Preview the advertisement;

    f.   Verify the validity of the email address provided (through use of an email sent by Backpage); and

    g.   Confirm the advertisement.

8.    The user may also pay for premium services, such as re-posting the ad to the top of the list for the designated category periodically.  I am aware that ads are listed on Backpage according to the time at which they were posted, and the ads near the top of the list tend to yield the most interest from viewers.

9.    Based upon my training and experience in conducting investigations of prostitution and sex trafficking operations, I know that the adult section of Backpage, and in particular the escort category, contains advertisements for prostitutes.  Although located in the "escort" category, these advertisements are often thinly-veiled offers of commercial sex.  These Internet posts may advertise either or both of "in calls," where the customer would typically meet with a prostitute in a hotel room rented by and/or for the prostitute, or "outcalls," where the prostitute meets a customer at his/her home or other location of the customer's choosing.  I am aware, based on my training and experience in prostitution investigations, that Backpage ads are often used as a mechanism for pimps, prostitutes, or those working for pimps, to post advertisements for prostitution.

10.    I am also aware, based on my training and experience, that pimps or those working with pimps may take actual photos of the girls or women working as prostitutes, often

4

WAB

using smart phones, tablet devices, and/or digital cameras, and then post those pictures to prostitution advertisements.  In some cases, rather than posting directly from a smartphone, tablet, or other Internet-enabled device, the photos may also be texted or emailed to an address accessible to the pimp, for saving on a computer and use in a subsequent advertisement.  Photos from a digital camera typically must be downloaded to a computer, and then may be uploaded to the Internet.

11.     I am also aware, based on my training and experience, that pimps and prostitutes typically use cellular phones, including smartphones, to conduct business related to prostitution. Phones are typically used (i) to provide a phone number on Internet or print prostitution advertisements for a potential customer to call – these phones are typically carried by a prostitute or another individual working for the pimp who may set up appointments for the prostitutes; and (2) to maintain communication between the pimp and the prostitutes or other associates who work for the pimp in his/her operation.  Your affiant is aware, based on past investigations and interviews of prostitutes, that pimps often require their prostitutes to maintain constant contact with their pimps regarding their prostitution activities.  Phones or other devices with Internet access may also be used to post prostitution advertisements directly.

12.     I have also learned that it is common for pimps to utilize more experienced women not only to work as prostitutes, but also to actively recruit other women to work for the pimp.  The term "bottom bitch" or simply "bottom" is used by pimps and prostitutes for the female that has been with the pimp for the longest or is the top earner, and often carries out the duties of recruiting new prostitutes and/or managing those prostitutes' activities.  The pimp may also employ women or girls, sometimes other prostitutes themselves, to answer phones and make

appointments for prostitutes, and may also employ other men to transport and/or supervise his prostitutes.

## SUMMARY OF FACTS SUPPORTING PROBABLE CAUSE

13.     KELSEY is currently serving a term of three years of state probation for an April 2014 conviction for possession of narcotics.  The address that KELSEY has registered as his residence with the Probation Office is 462 Hillside Avenue, 1st Floor, the TARGET PREMISES. A State of Connecticut court record lists KELSEY's address as 462 Hillside Avenue, Apt. 1F.  I believe that "1F" indicates that the apartment is on the first floor of the building, which would be the TARGET PREMISES.  Following an arrest in 2008, KELSEY provided his address to the Hartford Police Department as the TARGET PREMISES.

14.     The TARGET VEHICLE is the vehicle driven by KELSEY while he has been engaged in a running a prostitution operation, according to the witness statements described below.  Investigators have observed the TARGET VEHICLE parked at the TARGET PREMISES.  In July 2016, the Hartford Police Department received a domestic disturbance call regarding 462 Hillside Avenue in Hartford.  In the notes regarding the call, the dispatcher recorded that "Tony" was not answering his phone and that "Tony" drives a brown Chevy Impala older model car, which is consistent with the description of the TARGET VEHICLE.

Minor Victim 1

15.     On or about July 25, 2016, detectives of the Connecticut State Police were assigned to assist with locating a missing and potentially suicidal 17-year old female (hereafter "Minor Victim 1" or "MV-1"), who was the subject of a Silver Alert out of Connecticut State Police, Troop F.  While attempting to locate MV-1, it came to the attention of investigators that MV-1 may have been the victim of sex trafficking sometime in May of 2016.  MV-1 was

ultimately located by police on July 26, 2016, and then transported to a hospital for an

emergency committal due to her suicidal threats.  Prior to MV-1 being transported to the

hospital, a Connecticut State Police detective had a few moments to speak with her.  MV-1

indicated that she had been sex trafficked on Memorial Day Weekend of 2016 by a man named

"Blaze" and a female named "K."  She agreed to speak to the detective in more detail about the

sex trafficking incident at a later date.

      16.     In subsequent interviews with law enforcement, MV-1 disclosed that a few days

prior to Memorial Day Weekend 2016, she had used an application called Meetme on her mobile

phone to communicate with a female who used the screenname "Miss Money."  MV-1 provided

written consent for investigators to examine her mobile phone.  On the phone, investigators

found a screenshot of a portion of the conversation between "Miss Money" and MV-1 on

Meetme.  The profile picture for "Miss Money" on the Meetme website contains a photograph of

individuals whom investigators recognized as TONY KELSEY and KARI YATES and whom

MV-1 identified as "Blaze" and "K," respectively.  Additionally, the subscriber information for

the Meetme account did not contain an individual's name, but did contain the user's date of birth,

which matches the date of birth of KARI YATES.

      17.     Investigators were able to extract the full conversations between "Miss Money"

and MV-1 on Meetme from MV-1's mobile phone.  On May 25, 2016, "Miss Money" asked

MV-1:  "Hey girl, u down to make some fast cash $250hr starting soon as today?  Add me so we

can talk."  When MV-1 asked what would be required of her, "Miss Money" stated:  "I have two

phones full of clients who pay hundreds for massages and sexual favors. U could bring home

more than a weeks (sic.) pay in less than a day.. Would u be down?."  "Miss Money" further

stated:  "I will come pick u up and we go see clients at they (sic.) house 250 an hour up front

they never last the whole time." MV-1 asked: "How do I know that Im (sic.) not going to be killed or something," to which "Miss Money" responded: "Trust me u wont (sic.) i have other girls i work with and they never been hurt or force to do anything against they (sic.) will do u have a kik[1] or number I can text u on?."[2]

18.     "Miss Money" asked MV-1 to send "Miss Money" photographs of MV-1, including specifically a "full body" pic, "pics of [her] front," "one without [a] bra," and a "better ass pic." MV-1 told investigators that she sent several photographs to "Miss Money" through the Meetme application, including one where her bare chest is covered by her hands and she is wearing a necklace; this photographs does not show MV-1's face. Investigators could not locate these photographs on MV-1's phone; MV-1 stated that the photographs that MV-1 sent to "Miss Money" were not stored on MV-1's phone because they were taken through the Meetme application.

19.     "Miss Money" asked MV-1 if she wanted to go out with "Miss Money" on May 25, 2016, to which MV-1 responded that she could not because she was in school and had a curfew. When "Miss Money" asked MV-1 about MV-1's age, MV-1 lied and told "Miss Money" she was eighteen.

20.     On May 28, 2016, a person using the screenname "ms_kari_baybee" contacted MV-1 on the instant messaging application Kik. According to Kik, the subscriber to the "ms_kari_baybee" account listed the email address kari.yates@yahoo.com as the user's contact

---

[1] Based on my training and experience, I know that Kik is an instant messaging application headquartered in Canada.
[2] The Honorable Joan G. Margolis, United States Magistrate Judge, authorized a search warrant of the "Miss Money" Meetme account on November 22, 2016. In response, Meetme provided, among other things, records of several complaints from people other than MV-1 about "Miss Money" attempting through Meetme to recruit those individuals to work in prostitution.

email address.  The profile picture for the "ms_kari_baybee" account contained a photograph

that is similar to YATES' photograph from the Connecticut Department of Corrections.

21.     The Kik conversation between "ms_kari_baybee" and MV-1 was extracted from

MV-1's phone.  "ms_kari_baybee" said:  "Hey its k from meet me send pics."  MV-1 proceeded

to send several photographs of herself to "ms_kari_baybee," including one photograph depicting

her bare chest.  "Ms_kari_baybee" and MV-1 proceeded to discuss MV-1 going out with

"ms_kari_baybee" and ms_kari_baybee's boyfriend that night.  MV-1 said that she would have

to be home by midnight, to which "ms_kari_baybee" responded:  "how about 3am" because they

could make more money if they stayed out later.  MV-1 and "ms_kari_baybee" discussed how

MV-1 should dress for the occasion.  As part of the exchange on Kik, MV-1 requested that

"ms_kari_baybee" send a photograph of herself ("ms_kari_baybee") so that MV-1 could know

who she would be meeting.  "ms_kari_baybee" sent a photograph of a woman with blonde hair

wearing a black shirt and pink pants.  MV-1 later identified that photograph as depicting "K," the

woman who trafficked her on May 28, 2016, as described further below.  Around 9:23 pm, "K"

arrived at MV-1's residence.  "K" asked MV-1 if MV-1 had $20, but MV-1 replied that she

"literally only ha[d] [her] house key and [her] phone on [her]."  MV-1 reported that she was

carrying both an iPhone, which did not have cellular service, and an "emergency" phone that did

have cellular service.

22.     MV-1 stated that a man who was introduced as "Blaze" was driving and "K" was

in the front passenger seat.  MV-1 sat in the rear seat behind the driver.  MV-1 described the car

as an old "ghetto" car with no rims, which was later clarified to actually be a missing hub cap on

the vehicle.  MV-1 later positively identified a picture of the TARGET VEHICLE as the vehicle

"Blaze" was driving, specifically because of the spare tire with no hub cap on the rear left tire

and the distinct rear of the car.   The photograph of the vehicle that MV-1 identified was taken at the driveway of 462 Hillside Avenue in Hartford (the TARGET PREMISES); additionally, the vehicle is registered to KELSEY's mother at an address in Bloomfield, CT.  MV-1 also positively identified pictures posted on KELSEY's publicly-available Facebook page of KARI YATES as the person she knew as "K" and TONEY KELSEY as the person she knew as "Blaze."

 23. MV-1 stated that the first stop they made was the McDonalds located off of I-91, exit 27.  MV-1 stated that she stayed in the car while KELSEY and YATES went inside. According to MV-1, after visiting McDonald's, KELSEY and YATES drove MV-1 to their place of residence.  On a later occasion, MV-1 identified the residence as 462 Hillside Avenue in Hartford, the TARGET PREMISES.  She stated that the TARGET PREMISES was distinctive to her because KELSEY and YATES took her there several times during the night and she remembered a broken-down garage toward the back of the property with caution tape across an opening to the garage.  MV-1 also positively identified La Parada Market on the corner of Hillside Avenue and New Britain Avenue.  MV-1 stated that YATES and KELSEY went inside to get something to drink and MV-1 was left in the car parked right next to the market.  The market is only 1/10 mile from the TARGET PREMISES.

 24. MV-1 stated that sometime during the evening, KELSEY and YATES acquired drugs from an unknown location in Hartford.  They offered the drugs to MV-1 but she says that she refused.  After spending some time driving around Hartford, they pulled into a dark driveway area with a covered garage.  MV-1 said that she couldn't use her iPhone because she didn't have a cellular service plan and she had no WiFi access.  At this point, KELSEY and YATES gave MV-1 a cell phone to text back and forth with them.  MV-1 stated that she was then forced to

have oral sex with YATES in the backseat of the TARGET VEHICLE. MV-1 stated that her head was pushed between YATES's legs by YATES initially and that KELSEY held her head down. MV-1 reported that while MV-1 was forcibly performing oral sex on YATES, KELSEY pulled down MV-1's pants and starting having sex with MV-1. YATES and KELSEY indicated to MV-1 that they were having sex with her to see how experienced MV-1 was. MV-1 then stated that when it ended, KELSEY and YATES began to have sex. When that ended, MV-1 said she fell asleep in the back of the TARGET VEHICLE.

25.     MV-1 was then woken up by KELSEY and YATES because they had a man with whom MV-1 was to have sex for money. They told MV-1 that they would split the money 50/50 because KELSEY and YATES were providing protection, a ride and the clients. MV-1 was then instructed by KELSEY and YATES to leave her iPhone, keys, emergency cell phone and glasses (without which she cannot see well) in the car. They instructed her to leave her glasses in the car because in the photos that MV-1 had sent to them, MV-1 was not wearing glasses. MV-1 met the client, a black male approximately 60 years of age, outside of a brick apartment building in Hartford. According to MV-1, the man took her to his apartment, in which were lots of drugs. He offered her drugs, but she stated that she did not accept them. She got a $175.00 money order from the man and gave him oral sex. She stated that the male ejaculated in her mouth. She then went back outside, but KELSEY and YATES were not there. She texted them from the phone they had given her and they told her told her to go back into the man's apartment because he had more money for her and she would have to have sex with him. MV-1 went back inside; she stated that the man couldn't maintain an erection, so she left and met KELSEY and YATES outside in the TARGET VEHICLE. When she gave them the money order, they were upset that the payment was in money order form and told MV-1 she wouldn't

11

get any of the money until they went to the bank after the holiday weekend.  MV-1 stated that

she fell asleep in the back of the car again.  She believes that she fell asleep due all the stress

from what had been happening to her.

26.     MV-1 said that she was woken up again by KELSEY and YATES who said they

had another client for her.  Although MV-1 did not know this at the time, they had traveled to

Manchester, Connecticut, in the TARGET VEHICLE.  MV-1 described the area as a new

apartment complex still under construction with factories around it.  Investigators believe this

complex to be the Broadleaf Boulevard Apartments located on New State Street, Manchester,

CT.  MV-1 again was instructed by KELSEY and YATES to leave her iPhone, keys, emergency

cell phone and glasses in the car and to go inside an apartment.  MV-1 was initially crying to this

man, stating that she didn't want to be there, but he ended up making her have sex with

him.  MV-1 stated that the man took "selfie" photographs with her.  MV-1 was given $50.00

from this man for the sex and she stated that she was upset because she thought that she was

worth more than that.  MV-1 went back outside, where KELSEY and YATES asked for the

money.  MV-1 lied and said she didn't do anything with the customer and didn't get

any money.  MV-1 stated that she was crying and very upset at this point.  MV-1 got into

an argument with KELSEY and YATES, and told them her friend was coming to pick her

up.  According to MV-1, KELSEY and YATES left because they got nervous that MV-1 was so

upset.  MV-1 ended up using her "emergency cell phone" that she brought with her that night to

call her boyfriend.  MV-1 said that she walked to a place where she could find a street address to

report to her boyfriend the location.   MV-1's boyfriend picked her up, but she did not want to go

to the hospital because the individuals with whom she had had sex had all used condoms.

12

Backpage Records

27.     In the course of the investigation, I received records related to this investigation

from Backpage.com, a website on which escort services are frequently advertised, as described

above.  Based on an earlier investigation into KELSEY described below, I knew that the email

address that he uses on Backpage is tonebone4545@yahoo.com .  Backpage provided me with

more than 1,000 advertisements posted by the user account tonebone4545@yahoo.com.  The

phone number associated with that account is (860) 532-9793.

28.     Advertisements posted by the user account tonebone4545@yahoo.com on May

27, 2016, at 5:06 pm and 8:27 p.m. contain one of the photographs that MV-1 sent to "Miss K"

through Meetme on May 25, 2016.  That photograph does not depict MV-1's face, but MV-1

identified herself as the subject of the photo, which depicts a bare female chest wearing only a

necklace.

29.     Among other records, Backpage provided the Internet Protocol address associated

with postings associated with the tonebone4545@yahoo.com Backpage account.  An Internet

Protocol address (or simply "IP address") is a unique numeric address used by computers on the

Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by

periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP

address so that Internet traffic sent from and directed to that computer may be directed properly

from its source to its destination.  Most Internet service providers control a range of IP addresses.

Some computers have static—that is, long-term—IP addresses, while other computers have

dynamic—that is, frequently changed—IP addresses.

30.     Many of the Backpage ads associated with the tonebone4545@yahoo.com

Backpage account were posted from Internet Protocol address 73.149.27.203.  According to

Comcast Communications, that Internet Protocol address 73.149.27.203 was assigned between May 27-30, 2016, to 462 Hillside Avenue, Apt. 1, in Hartford, the TARGET PREMISES.

31.     The phone number (860) 532-9793, which is linked to the Backpage account for user tonebone4545@yahoo.com, is subscribed to by KELSEY, and the address listed for the subscriber is the TARGET PREMISES.  The (860) 532-9793 number was also provided by KELSEY to the Connecticut Department of Corrections when YATES was incarcerated, so that KELSEY could call YATES.

Minor Victim 2

32.     In the summer of 2015, the Hartford Police Department received a report that a seventeen-year-old girl (hereafter, "Minor Victim 2" or "MV-2") had been interviewed and had disclosed that she had been working as a prostitute for an individual named "Blaze."  In particular, MV-2 stated that she and a friend were trying to meet people through Meetme and a website called Plenty of Fish.  In May 2015, she and the friend decided to meet up with someone they had corresponded with on the Plenty of Fish website who went by the name of "Cheese," who took them to "Blaze's" house, where they met Blaze's brother, who was nicknamed "Smoke."  According to MV-2, "Blaze's" residence was located on the first floor of a residence on Hillside Avenue in Hartford.  After partying at Blaze's house, MV-2 reported that she told "Blaze" she was eighteen and asked "Blaze" about providing her and her friend protection while they were prostituting.  MV-2 reported that she was advertising on Backpage and another website on which escort ads frequently are posted.  MV-2 stated that she went by the name "Candy" in the ads and her friend went by the name "Sweet."  A family member of MV-2's who was also interviewed by police stated that she (the family member) viewed MV-2's electronic

devices and saw that saw that MV-2 was being advertised as "Candy Sweet" on two websites that advertise escort services.

33.     Between May 26, 2015, and June 2, 2015, a number of ads were posted on Backpage by the tonebone4545@yahoo.com account using the title "candy sweet." The phone number listed in several of those Backpage ads is (860) 532-9793, the phone number that is subscribed to by KELSEY and that is associated with the tonebone4545@yahoo.com Backpage account.

<u>Minor Victim 3</u>

34.     On November 18, 2016, a third minor victim (hereafter "Minor Victim 3" or "MV-3") was encountered by police in Wethersfield, Connecticut, after being reported missing by her family. The minor initially reported that she was picked up by a male named "Blaze" and was taken to the City Side Inn in Wethersfield. MV-3 said that she performed prostitution acts with at least one customer while at the motel. "Blaze" threatened her with a knife, according to a brief statement she gave while in the hospital after being recovered by police.

35.     On November 22, 2016, investigators engaged in a further interview with MV-3. She stated that on November 17, 2016, she was walking down the street in Avon, Connecticut, when a silver car approached her.[3] She stated that the driver was named "Blaze" and later identified a photograph of KELSEY as "Blaze." She further stated that a heavyset red-haired

---

[3] MV-3's mother was interviewed in the course of the investigation. She stated that MV-3 stayed home from school on November 17, 2016, because MV-3 was not feeling well. A security system in the house alerted MV-3's mother that a door to the residence was opened and then closed at approximately 11:21 a.m. on November 17. MV-3 was not at home when an adult arrived at the house at approximately 4:30 p.m. MV-3's mother reported MV-3 missing and attempted to communicate with MV-3's friends on Facebook in an attempt to locate MV-3; in response, one person said that he communicated with MV-3 at approximately 11:45 a.m. on November 17 and MV-3 had said she was "about to make $300."

white female who went by the names of "Jasmine" and "Lindsey" was in the car with Blaze. According to MV-3, they told her to get in the car or they would hurt her, and they took MV-3 to her residence to put something "pretty" on, after which MV-3 got back into the vehicle with them.  At some point while in the car, MV-3 reported that Blaze gave MV-3 the drug "Molly" and told her to take it; he stated that it would give her more energy and help her focus on sex and making money.

36.     MV-3 further stated that she, Blaze, and Jasmine began driving around the city of Hartford.  Blaze and Jasmine were using a cell phone application called Textnow to set up appointments with prostitution clients and, according to MV-3, Blaze had more than 100 clients inquiring about services at one point.  MV-3 stated that Blaze and Jasmine explained to MV-3 that she was going to have sex with clients for money; the prices were $120 for an hour, $80 for half an hour, an extra $20 for kissing, and an extra $40 for not using a condom.  MV-3 was to split the money with Blaze 50/50.  Blaze gave MV-3 a cell phone that, according to MV-3, was able to call only Blaze or Jasmine.  Blaze would call or text MV-3 when a client was coming and MV-3 was to call or text Blaze as soon as MV-3 was done with the client.  MV-3 stated that Blaze often took almost all of her money for food, drinks, weed, and "penalties," which were amounts that MV-3 had to pay Blaze when she did not get enough money from clients.  MV-3 described an incident in Blaze's vehicle when MV-3 did not give him enough money; he pulled a black handgun out of his pants and held it to MV-3's head while saying, "If you don't give me my money, I'm going to kill you."  Blaze also took extra money to buy prepaid cards from CVS to put the ads "at the top of the list."  I know from my training and experience that a user can pay to have Backpage list the user's ads appear at the top of a particular page, in an effort to be the first ads a customer sees.

16

37.     MV-3 stated that she saw at least five clients on the evening of November 17, 2016, and the morning of November 18, 2016, some of which described as "car dates." At some point during the evening, an adult female joined MV-3, Blaze, and Jasmine. According to MV-3, these four individuals went to the City Side Inn in Wethersfield so that MV-3 and the adult female could perform prostitution appointments. Blaze drove the TARGET VEHICLE to the City Side Inn. While there, Blaze set up a prostitution appointment at the Mohegan Sun casino. The adult female drove herself, MV-3, Blaze, and Jasmine in her (the adult female's) car toward Mohegan Sun, but they got in a car accident. They abandoned the vehicle and went back to the TARGET PREMISES before returning to the City Side Inn in a taxi. While at the City Side Inn, MV-3 had sex with a client while the adult female was in an adjoining room. The client gave MV-3 only $30, despite that the agreed-upon rate was $120. After the appointment, MV-3 gave Blaze the $30 but he became extremely angry at MV-3 because of the low amount. According to MV-3, Blaze threatened to "poke," or stab, her with a knife. Shortly thereafter, MV-3 and the adult female escaped to a coffee shop and called police.

38.     The adult who was with MV-3 and "Blaze" was identified in the course of the investigation and will hereafter be referred to as Confidential Witness 1 or "CW-1." CW-1 has no prior criminal history. CW-1 reported that she met TONEY KELSEY, aka "Blaze," through the Meetme application in October 2016 and has been working as a prostitute for KELSEY and a woman named "Jasmine" for about one month.

39.     CW-1 identified the TARGET PREMISES as KELSEY's home and said that he lives there with his mother Patty and his brother "Smoke." CW-1 stated that she spent days at a time sleeping in KELSEY's bedroom in the TARGET PREMISES and that she was not allowed to walk around the TARGET PREMISES without being escorted by KELSEY. KELSEY and

17

his family only had access to the first floor of 462 Hillside Avenue.  According to CW-1,

KELSEY kept two cellular phones with him at all times, including while he was in his residence.

CW-1 stated that KELSEY also had at least two other Android-type cellular phones in the

residence that KELSEY said he did not use anymore.  KELSEY told CW-1 that there was a

laptop inside the residence, but CW-1 never saw it.  CW-1 stated that KELSEY's brother

"Smoke" had a computer in his bedroom.

      40.     KELSEY would set up prostitution appointments for CW-1 and CW-1 would split

the profits with KELSEY.  CW-1 stated that KELSEY would set up ads on Backpage for CW-1

and, later, MV-3.  Regarding MV-3, CW-1 stated that while CW-1 was at the TARGET

PREMISES, CW-1 met MV-3.  CW-1 further noted that KELSEY would take MV-3 to other

people's houses to partake in prostitution.  On November 17, 2016, CW-1 drove to the City Side

Inn in Wethersfield, where she and MV-3 were going to see prostitution clients.  KELSEY

followed them in the TARGET VEHICLE.  After arriving at the City Side Inn, an appointment

was set up at the Mohegan Sun casino area.  According to CW-1, KELSEY left the TARGET

VEHICLE at the City Side Inn and CW-1 drove MV-3, Jasmine, and Blaze toward the casino.

They got in a car accident and KELSEY advised CW-1 to abandon her car.  The group then went

back to the TARGET PREMISES and then took a taxi to the City Side Inn, arriving around 4

a.m. on November 18, 2016.  KELSEY and "Jasmine" then said they would set up prostitution

clients for CW-1 and MV-3, after which KELSEY and "Jasmine" left the hotel.  CW-1 stated

that shortly thereafter, a client arrived for MV-3.  The client only had $30, despite that the

agreed-upon cost was $120.  MV-3 proceeded to have sex with the client and took the $30,

which she was supposed to split with KELSEY.  CW-1 reported that after the client left,

KELSEY and "Jasmine" became upset with MV-3 because she had accepted less than $120 and

began threatening CW-1 and MV-3, saying they would kill them.  KELSEY then refused to take CW-1 home, according to CW-1.

41.     MV-3 then told CW-1 that MV-3 was underage.  CW-1 reported MV-3's age to KELSEY and "Jasmine" and the three of them argued.  KELSEY and "Jasmine" then left the motel.  CW-1 and MV-3 walked to a nearby coffee shop, where they were able to discuss the situation with police.  MV-3 was taken to the hospital thereafter and remains hospitalized.  CW-1 reported that KELSEY provided "molly," a controlled substance, to MV-3.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

42.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the TARGET PREMISES and in the TARGET VEHICLE, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

43.     *Probable cause.*  I submit that if a computer or storage medium is found on the TARGET PREMISES or in the TARGET VEHICLE, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being

used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

44.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET PREMISES or in the TARGET VEHICLE because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the

20

United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on

21

the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know that when an individual uses a computer or other electronic device to access the Internet for the purposes of advertising prostitution services, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

45.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly

22

examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

46.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

47.     Because several people share the TARGET PREMISES as a residence, it is possible that the TARGET PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

48.      Based on the aforementioned factual information, I respectfully submit that there

is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted

violations, of 18 U.S.C. Sections 1591 and 1594(c) may be located in the SUBJECT

ACCOUNTS described in Attachment A.  I therefore request that the Court issue the proposed

search warrants.

## REQUEST FOR SEALING

49.      I further request that the Court order that all papers in support of this application,

including the affidavit, applications for search warrants, and search warrants, be sealed until

further order of the Court.  These documents discuss an ongoing criminal investigation that is

neither public nor known to all of the targets of the investigation.  Public disclosure of this

affidavit, the application for the search warrants, and the search warrants would alert the targets

of the investigation to the fact that they are being investigated and could cause them to flee,

destroy evidence, or tamper with witnesses, including MV-1, MV-3, and CW-1, whose

cooperation with the investigation is confidential.  Disclosure could also subject the law

enforcement agents who are executing this warrant to threats to their safety.  Accordingly, there

is good cause to seal these documents because their premature disclosure may seriously

jeopardize that investigation.

Respectfully submitted,

WENDY BOWERSOX
SPECIAL AGENT, FBI

SUBSCRIBED and SWORN to before me on November 28, 2016, in New Haven, Connecticut.

/s/

Hon. Joan G. Margolis
United States Magistrate Judge

## ATTACHMENT A-1

**Property to Be Searched:  462 Hillside Avenue, First Floor, Hartford, Connecticut**

The property to be searched is 462 Hillside Avenue, First Floor, Hartford, Connecticut. The address of 462 Hillside Avenue is a three-story multi-family dwelling with cream/gray-colored siding, with a driveway along the right side of the building.  It has a covered front porch with the house number "462" above the mailboxes.  From the porch, there are two white front doors.



2

## ATTACHMENT A-2

### Property to Be Searched:

### Tan-Colored 2002 Chevrolet Impala Bearing Connecticut License Plate AD-45675

The property to be searched is a tan-colored 2002 Chevy Impala vehicle bearing Connecticut license plate AD-45675. The vehicle is registered to Patty Hamlett at the address of 102 Boothbay Street, Bloomfield, Connecticut, but is frequently parked outside of 462 Hillside Avenue in Hartford, Connecticut, and is believed to be operated by TONEY KELSEY.



3

**ATTACHMENT B**

**Things to be Seized**

All items that constitute fruits, evidence and instrumentalities of violations of 18 U.S.C. Sections 1591 (sex trafficking of a minor and sex trafficking by force, fraud, or coercion) and 1594(c) (conspiracy to commit sex trafficking) involving TONEY KELSEY and KARI YATES for the period between May 1, 2015, and present, including information pertaining to the following matters:

a. Documents, items, photographs, and records referencing Minor Victims 1, 2, and 3 and CW-1, whose appearance and identity are known to law enforcement, Toney Kelsey, Kari Yates, and/or any other individuals involved in prostitution-related activity;

b. Evidence of prostitution-related activity, in any form, involving any individual, including ledgers, condoms, Internet advertisements for prostitution, and communications regarding prostitution appointments;

c. Financial documents, items, and records, including credit or debit cards and prepaid credit or debit cards and related records, and evidence regarding money transmittals through Western Union, Money Gram, or other money transmittal business;

d. Evidence of profits of a prostitution operation, including United States currency and jewelry;

e. Records concerning rental of hotels or motels, including the City Side Inn in Wethersfield, Connecticut;

f. Evidence of local, intrastate, and international travel concerning Minor Victims 1, 2, and 3, CW-1, Toney Kelsey, and Kari Yates;

g. Controlled substances, including "Molly";

h. Weapons, including firearms and/or knives;

i. Computers, tables, electronic devices, or storage media used as a means to commit the violations described above or for which there is probable cause to believe contain evidence of the violations discussed above, including GPS units;

j. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    i. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and

1

passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

ii.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.  evidence of the lack of such malicious software;

iv.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

v.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

vi.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

vii.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

viii.  evidence of the times the COMPUTER was used;

ix.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

x.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

xi.  records of or information about Internet Protocol addresses used by the COMPUTER;

xii.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii.  contextual information necessary to understand the evidence described in this attachment.

k.  Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

2

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.